## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **JLK Construction, LLC,** | ) | **Case No. 23-50034** |
| | ) | |
| Debtor. | ) | **Chapter 11** |
| | ) | |
| | ) | |
| | ) | |
| **JLK Construction, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 23-4032** |
| | ) | |
| **Premium Merchant Funding 18, LLC,** | ) | |
| **Abe Burger, and** | ) | |
| **Samuel A. Brugman** | ) | |
| Defendants. | ) | |

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION TO DISMISS AND GRANTING
### PLAINTIFF'S MOTION FOR LEAVE TO AMEND

Plaintiff JLK Construction, LLC filed its second amended adversary complaint [Dkt. No. 50], asserting ten counts under state and federal law. Defendants Abe Burger; Samuel Brugman; and Premium Merchant Funding, LLC (all represented by the same counsel) move for the court to dismiss counts one (for fraud), six (also for fraud), and ten (for racketeering) of JLK's adversary complaint. Among other things, the movants argue JLK fails to state claims under those counts because JLK's allegations do not enable the court to draw the reasonable inference that the movants are liable for the misconduct alleged. JLK resists and requests leave to file an amended complaint for any count the court dismisses.

For the reasons set forth below, the court GRANTS the movants' motion to dismiss count one and GRANTS the motion to dismiss count six against defendant Burger only.  The court, however, DENIES the motion to dismiss count six against all other movants and DENIES the motion to dismiss count ten. The court further GRANTS JLK's request for leave to file an amended complaint.

## BURDEN OF PROOF

As movants, PMF, Burger, and Brugman bear the burden to establish that the challenged counts of JLK's adversary complaint are insufficient. *See Gill Constr., Inc. v. 18th & Vine Auth.*, No. 05-0608-CV-W-SOW, 2006 WL 8438149, at *1 (W.D. Mo. July 11, 2006) (assigning burden of proof to party requesting dismissal under Rule 12(b)(6)).

## BACKGROUND

The court derives the following background information from the amended complaint and attached exhibits, statements counsel for each party made at oral argument, and the record in this adversary proceeding and JLK's chapter 11 bankruptcy case.[1]

---

[1] The court derives facts from public records relating to JLK's bankruptcy and this adversary proceeding only to the extent those facts do not conflict with the complaint and only to provide relevant background information. *See Blakley v. Schlumberger Tech. Corp.*, 648 F.3d 921, 931 (8th Cir. 2011) ("In addressing a motion to dismiss under Federal Rule of Civil Procedure 12(b), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record.") (internal quotation marks omitted); *Z.J. v. Kansas City*, No. 4:15-cv-00621-FJG, 2016 WL 4126569, at *3 (W.D. Mo. Aug. 2, 2016) ("[S]ome materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss.") (citation omitted).

Plaintiff JLK Construction, LLC is an excavation, dirt-moving, and concrete flatwork business.[2] Defendant Premium Merchant Funding 18, LLC (PMF) allegedly agreed to provide consulting services to, and obtain financing for, JLK.[3] JLK alleges defendant Abe Burger is PMF's Chief Operating Officer,[4] and Samuel Brugman is an account manager for PMF.[5] JLK further alleges "each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other."[6]

The present adversary proceeding arises from transactions JLK and PMF entered into in early 2022 and the events leading up to those transactions.[7] JLK alleges that beginning in 2019, Brugman began to solicit JLK to offer PMF's business services.[8] JLK further alleges that JLK and PMF ultimately entered into a consulting agreement in February 2022,[9] and that PMF provided JLK with funds pursuant to a separate contract executed in April 2022.[10] As to the consulting agreement, JLK alleges it paid PMF $450,000 as a "commission" for financing PMF arranged between JLK and a third party,[11] but "PMF failed to provide the services as represented in the Consulting Agreement." [12] As to the contract for PMF's separate provision of funds,

---

[2] *See* Third Am. Disclosure Statement at 6, *In re JLK Construction, LLC*, No. 23-50034 (Bankr. W.D. Mo. Feb. 8, 2024), Dkt. No. 375.
[3] *See* Second Am. Compl. 4–6 ¶¶ 14, 17, Dkt. No. 77, Apr. 18, 2025 (describing the (1) PMF loan brokering offer to JLK and (2) consulting agreement). The cited pleading was filed in this adversary proceeding. All subsequent citations to the record in this order refer to pleadings filed in this adversary proceeding unless otherwise noted.
[4] *Id.* at 3 ¶ 3.
[5] *Id.* at 3 ¶ 4.
[6] *Id.* at 4 ¶ 12.
[7] *See* Ex. 1 to Second Am. Compl. 1; Ex. 4 to Second Am. Compl. 1.
[8] Second Am. Compl. 4 ¶ 13.
[9] *Id.* at 6 ¶ 17.
[10] *Id.* at 16 ¶ 56 (describing loan from PMF on April 5).
[11] *See id.* at 6 ¶ 17 (describing the consulting agreement between PMF and JLK); *id.* at 9 ¶ 27 (describing payment of "commission").
[12] *Id.* at 26 ¶ 92.

JLK alleges that the contract required JLK to pay PMF more funds than JLK received and to complete all payments within 120 business days after the date JLK received the funds.[13]

The parties disagree about the correct characterization of the transaction for PMF's provision of funds. The movants contend that JLK's funding contract was for PMF's purchase of JLK's future monetary receipts—a characterization that aligns with the language the contract uses to describe the parties' transaction.[14] In contrast, JLK argues the contract gave rise to a "fraudulent loan[] that PMF misleadingly labeled a sale of 'future receipts.'"[15] JLK further argues that the effective annual interest rate on the alleged loan was 294.3%.[16]

Between April and September 2022, JLK made several payments to PMF under the contract for PMF's provision of funds.[17] JLK alleges PMF obtained these payments by "withdrawing funds from [JLK's] accounts."[18]

JLK filed a chapter 11 bankruptcy petition with this court in February 2023.[19] Several months later, JLK commenced this adversary proceeding, originally asserting fourteen counts.[20] After the court twice granted in part PMF's earlier

---

[13] *Id.* at 16 ¶ 56.
[14] *See generally* Ex. 4 to Second Am. Compl. (characterizing the transaction as JLK's sale of future entitlements to payment).
[15] Second Am. Compl. 2 ¶ 2.
[16] *Id.* at 17 ¶ 58.
[17] *See generally* Ex. 5 to Second Am. Compl. (listing payment dates).
[18] Second Am. Compl. 18 ¶ 69.
[19] Voluntary Pet., *In re JLK Construction, LLC,* No. 23-50034 (Bankr. W.D. Mo. Feb. 13, 2023), Dkt. No. 1.
[20] Compl., Dkt. No. 1, Oct. 25, 2023.

motions to dismiss prior versions of the present complaint,[21] JLK amended the complaint to assert the ten counts that are currently before the court.[22] In count one, JLK asserts the movants engaged in constructive fraud in connection with the consulting agreement.[23] In counts two, three, and four, JLK seeks avoidance and recovery of the $450,000 transfer it made to PMF under the consulting agreement as allegedly fraudulent under federal and state avoidance laws.[24] In count five, JLK seeks a declaratory judgment that the contract for PMF's provision of funds was for a loan rather than a sale of receivables.[25] In count six, JLK asserts a claim for constructive fraud in connection with the contract for PMF's provision of funds.[26] In counts seven, eight, and nine, JLK seeks avoidance and recovery of the transfers it made to PMF under the contract for PMF's provision of funds as allegedly fraudulent under federal and state avoidance laws.[27] Finally, in count ten, JLK seeks a civil judgment against the movants under the Racketeer Influence and Corporate Organizations Act (RICO).[28]

The movants ask the court to dismiss counts one, six, and ten of the second amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[29]

---

[21] Order Granting Defs.' Mot. Dismiss and Granting Part Pl.'s Mot. Leave Amend, Dkt. No. 49, June 17, 2024; Order Granting Part and Denying Part Defs.' Mot. Dismiss and Granting Pl.'s Mot. Leave Amend ("Order First Am. Compl."), Dkt. No. 76, Mar. 19, 2025.

[22] Second Am. Compl., Dkt. No. 77, Apr. 18, 2025.

[23] *Id.* at 5–11 ¶¶ 16–37.

[24] *Id.* at 11–16 ¶¶ 38–52.

[25] *Id.* at 16–23 ¶¶ 53–83.

[26] *Id.* at 23–29 ¶¶ 84–105.

[27] *Id.* at 29–38 ¶¶ 106–31.

[28] *Id.* at 38–50 ¶¶ 132–72.

[29] Defs.' Mot. Dismiss Claims Relief One, Six and Ten ("Defs.' Mot. Dismiss Second Am. Compl."), Dkt. No. 82, May 2, 2025. Though defendants originally also asked the court to dismiss all claims against Burger under 12(b)(2), the defendants agreed at a January 8, 2025, status conference that JLK

Having summarized the relevant background information, the court turns to the
merits of the movants' motion to dismiss.

## ANALYSIS

Rules 8(a)(2), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, which
apply to this adversary proceeding under Rules 7008, 7009, and 7012 of the Federal
Rules of Bankruptcy Procedure, govern the movants' remaining alleged grounds for
dismissal. Rule 8(a)(2) requires a plaintiff to include in its complaint "a short and
plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R.
Civ. P. 8(a)(2). When a party states a claim for fraud, the pleading standard is more
stringent. Specifically, under Rule 9(b), a party alleging fraud "must state with
particularity the circumstances constituting fraud," except that "[m]alice, intent,
knowledge, and other conditions of a person's mind may be alleged generally." Fed.
R. Civ. P. 9(b). To sufficiently plead fraud under Rule 9(b), the plaintiff "must allege
the time, place, speaker, and sometimes even the content of the alleged
misrepresentation" that gives rise to the claim of fraud. *Ouaknine v. MacFarlane*, 897
F.2d 75, 79 (2d Cir. 1990); *see also United States ex rel. Joshi v. St. Luke's Hosp., Inc.*,
441 F.3d 552, 556 (8th Cir. 2006) ("[T]he complaint must plead such facts as the time,
place, and content of the defendant's false representations, as well as the details of
the defendant's fraudulent acts, including when the acts occurred, who engaged in
them, and what was obtained as a result.").

Rule 12(b)(6) empowers parties to file motions to dismiss a complaint for

---

properly served Burger. Thus, the motion to dismiss under Rule 12(b)(2) is not presently at issue and
the court confines its analysis to the Rule 12(b)(6) motion.

"failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).
To avoid dismissal under Rule 12(b)(6), a complaint must include sufficient factual
content to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544, 570 (2007). A complaint states a facially plausible claim if
the alleged facts provide the defendant with "'fair notice' of the nature of the claim,
[and the] 'grounds' on which the claim rests." *See id.* at 555 n.3 (construing Fed. R.
Civ. P. 8(a)(2)). Under this standard, the court should not dismiss a complaint under
Rule 12(b)(6) if the facts pleaded enable the court to "draw the reasonable inference
that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009). If the complaint lends itself to "at least one plausible reading [that]
'allows the court to draw the reasonable inference that the defendant is liable,'" the
court should not dismiss the complaint. *Norfolk & Dedham Mut. Fire Ins. Co. v.
Rogers Mfg. Corp.*, 122 F.4th 312, 316 (8th Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678).

The court takes a multistep approach to determining whether the complaint
states a facially plausible claim. *See, e.g.*, *Santiago v. Warminster Twp.*, 629 F.3d 121,
130 (3d Cir. 2010) (setting forth the three-step test). First, the court must determine
the elements of each cause of action in the complaint. *Id.* Next, the court must
consider all allegations together, accept them as true, and construe them in favor of
the plaintiff. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)
(construing *Iqbal*, 556 U.S. at 678–79); *Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir.
2017) (requiring court to construe allegations in favor of plaintiff). But the court may
disregard "formulaic recitation[s] of the elements of a cause of action," *Braden*, 588

F.3d at 594 (citations omitted), and need not accept any allegations that amount to mere "conclusory statements" or "legal conclusion[s] couched as [] factual allegation[s]." *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 225–26 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). "In addition, some factual allegations may be so indeterminate that they require 'further factual enhancement' in order to state a claim." *Braden*, 588 F.3d at 594 (citations omitted). Finally, the court must analyze each count independently to determine whether the complaint states a viable claim for each element of each cause of action. *See, e.g.*, *Santiago*, 629 F.3d at 130 (analyzing each count individually to "determine whether they plausibly give rise to an entitlement for relief") (citation omitted).

Applying this test, the court will analyze the counts at issue in JLK's second amended complaint below. For the reasons the court explained in its analysis of choice of law in its order granting the movants' motion to dismiss the original complaint,[30] to the extent the complaint implicates state law, the court analyzes the sufficiency of each count under New York law.

## I.    Constructive Fraud

In counts one and six of the second amended complaint, JLK alleges movants PMF, Burger, and Brugman engaged in constructive fraud in connection with PMF's consulting and MCA agreements with JLK. The movants ask the court to dismiss these counts because JLK did not correct the deficiencies the court identified in its order granting the movants' motion to dismiss the first amended complaint, and JLK

---

[30] Order Granting Defs.' Mot. Dismiss and Granting Part Pl.'s Mot. Leave Amend 12–23, Dkt. No. 49, June 17, 2024.

does not plead these counts with particularity under Rule 9(b). For the reasons the court explains below, the court determines count one still does not satisfy Rule 9(b), but JLK adequately pleads count six. Accordingly, the court GRANTS the movants' motion to dismiss count one but DENIES the movants' motion to dismiss count six.

As the court explained in its prior dismissal order, to state a claim for constructive fraud under New York law, a plaintiff must allege:

> (1) a representation was made, (2) the representation dealt with a material fact, (3) the representation was false, (4) the representation was made with the intent to make the other party rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted[,] and (7) the parties are in a fiduciary or confidential relationship.

*Del Vecchio v. Nassau Cnty.*, 499 N.Y.S.2d 765, 768 (N.Y. App. Div. 1986) (citing *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193 (N.Y. App. Div. 1980)). These elements are identical to the elements of actual fraud, except that constructive fraud requires a fiduciary or confidential relationship as a substitute for the scienter element of actual fraud (which instead requires that the defendant knew the alleged misrepresentation was false). *Brown*, 432 N.Y.S.2d at 193–94; *People v. Credit Suisse Sec. (USA) LLC*, 107 N.E.3d 515, 527 n.2 (N.Y. 2018) (Feinman, J., concurring) (distinguishing constructive fraud from equitable fraud in dicta); *see also Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (articulating the elements of actual fraud). Though constructive fraud does not require that the defendant act with fraudulent intent, the law declares conduct satisfying the above elements constructively fraudulent "because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of

9

special protection." *Brown*, 432 N.Y.S.2d at 193.

In the following subsections, the court analyzes JLK's pleading of these elements with respect to counts one and six in turn.

### A.   JLK Does Not State a Claim for Constructive Fraud in Connection with the Consulting Agreement

In count one, JLK appears to plead[31] that PMF, Burger, and Brugman engaged in constructive fraud by representing that PMF "was entitled to a 9% fee for placing the loan" with Newtek.[32] JLK argues that this alleged representation was materially false under the first three elements of constructive fraud (that a representation (1)

---

[31] JLK's theory under count one has been difficult to discern throughout its iterations of the complaint, and its precise theory remains ambiguous on the face of the second amended complaint. Despite the ambiguity, JLK has repeatedly characterized this count as one for PMF's allegedly fraudulent misrepresentations concerning its entitlement under SBA regulations to the commission it received from JLK. JLK first attempted to articulate this commission-entitlement theory in its supplemental briefing in response to the movants' motion to dismiss the first amended complaint. Resp. Suppl. Briefing Mot. Dismiss Claims Relief One, Two, Five, Six and Ten and All Claims Against Burger and Brugman 6, Dkt. No. 71, Nov. 18, 2024 ("[T]he wrong was not the inducing Plaintiff to enter the Consulting Agreement, it was Defendants' having Plaintiff enter a[n] SBA business loan agreement without disclosing it did not have a right to the commission it demanded."). After the court rejected JLK's invitation to opine on JLK's belated recharacterization of this then-unpled theory, JLK amended the complaint to more forcefully articulate its allegations that PMF was not entitled to a commission under SBA regulations. Second Am. Compl. 9–11 ¶¶ 28–30, 34. JLK again purported to clarify in its opposition to the present motion to dismiss that the allegedly false representation at issue in this count is "that Plaintiff owed PMF $450,000, and concealed from Plaintiff that the commission fees in an SBA loan are paid by the lender, not the borrower." JLK Construction LLC's Opp'n Mot. Dismiss First, Sixth and Tenth Claims Relief Second Am. Compl. ("JLK's Opp'n Mot. Dismiss") 1, Dkt. No. 83, May 23, 2025. And at oral argument, counsel for JLK again characterized its theory as premised on PMF's lack of entitlement to the commission under SBA statutes and regulations. Tr. Hr'g Mot. Dismiss Adversary Proceeding 6:14–18, Dkt. No. 92, July 14, 2025. Thus, though some allegations in the complaint arguably implicate other theories concerning the movants' entitlement to the commission, the court accepts JLK's purported clarification of its present theory and confines its analysis to a theory of constructive fraud premised on PMF's alleged misstatements concerning its entitlement to its commission under SBA regulations.

[32] Second Am. Compl. 9 ¶ 28. JLK does not allege that PMF made any specific statement that it was entitled to the commission but instead alleges PMF made two statements that JLK construes as akin to statements of entitlement to the commission: (1) Brugman's "request and forward[ing of] wiring instructions" on PMF's behalf, *id.* at 8 ¶ 26, and (2) PMF's "advising [JLK] to enter the Newtek loan." *Id.* at 9 ¶ 28. Because the effect of these statements is a question of fact more appropriate for summary judgment and because JLK's legal theory is untenable regardless of whether these statements are affirmative statements of entitlement, the court assumes for the purposes of this order that these statements amount to statements that PMF was entitled to the commission.

was made, (2) dealt with a material fact, and (3) was false) because "federal [Small Business Administration (SBA)] regulations say [the movants] don't have the right to a commission."[33] For the following reasons, including because the cited provisions guide the SBA's administration of its lending program and do not operate to deprive the movants of their contractual rights,[34] the court determines PMF's alleged representation concerning its entitlement to the commission is not a materially false representation under the first three elements of constructive fraud.[35]

To analyze adequately whether the cited provisions render PMF's alleged representation materially false, the court must briefly explain how the SBA operates. The SBA is a United States agency that exists to aid small businesses. *See* 15 U.S.C. § 631(a) (declaring policy of aid to small business concerns); *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960) (describing authority and purpose of SBA). The agency accomplishes this purpose in part by making loans available to businesses that cannot obtain traditional financing, often by serving as a guarantor on qualifying loans under the so-called "7(a) loan" program. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979) ("Section 7(a) of the Small Business Act . . . permits

---

[33] Tr. Hr'g Mot. Dismiss Adversary Proceeding 6:14–15.

[34] The mere fact of noncompliance with a regulation does not negate parties' contractual rights. *See, e.g., Dunlop v. Mercer (In re Dunlop)*, 156 F. 545, 546 (8th Cir. 1907) ("The general rule that illegal contracts are void is not of universal application. It is qualified by the exception that where a contract is not evil in itself, and its invalidity is not denounced as a penalty for its violation by the express terms of the statute, or by rational implication from the language of the statute which it violates, and that statute prescribes other specific penalties, it is not the province of the courts to do so, and they will not thus affix an additional penalty not intended by the lawmaking power.").

[35] The court does not opine on PMF's entitlement to the commission under the operation of the parties' contract and does not analyze whether PMF breached its contract with JLK. Instead, the court exclusively analyzes whether the SBA regulations operate to eliminate PMF's contracted-for rights under JLK's constructive fraud theory.

extension of financial assistance to small businesses when funds are 'not otherwise available on reasonable terms from non-Federal sources.' The SBA prefers to guarantee private loans rather than to disburse funds directly.") (citing 15 U.S.C. § 636(a)(1)–(2); 13 C.F.R. §§ 120.2(b)(1), 122.15(c) (1978)). To safeguard the integrity of the 7(a) program, Congress has authorized the SBA to oversee the program and has imposed specified prerequisites to program participation. *See, e.g.*, 15 U.S.C. § 642 ("Requirements for loans"); SBA S.O.P. 50 57 § 1(C) (3d ed. 2023), 2023 WL 5036027 (describing "General Policy and Goals" of the 7(a) program and instructing lenders about balancing of interests). For example, among the oversight and lending provisions discussed in more detail below, governing authority requires loan applicants to prove that other lending institutions have refused to lend to them, 15 U.S.C. § 642; empowers the SBA to investigate loan recipients, 15 U.S.C. § 634(b)(11); and authorizes the SBA to undertake formal or informal enforcement actions against lenders who default against SBA contracts, 13 C.F.R. §§ 120.1300–1400. The governing authority does not, however, create substantive rights between parties. *Crandal v. Ball, Ball & Brosamer, Inc.*, 99 F.3d 907, 909 (9th Cir. 1996).

Here, JLK appears to argue that PMF's statements concerning its entitlement to its commission were materially false because SBA statutes and regulations prohibit the commission. Specifically, JLK argues PMF was not entitled to the commission because (1) PMF concealed JLK's obligation to disclose the commission to the SBA under 15 U.S.C. § 642; and (2) 13 C.F.R. 103.5(c) prohibits Lender Service Providers from charging compensation to borrowers. The court refutes each

12

purported basis in turn.

First, § 642 does not render PMF's statement concerning its entitlement to a

commission materially false.

Section 642 imposes (and is titled) "Requirements for loans." Section 642

states:

> *No loan shall be made* . . . to any business enterprise unless the owners,
> partners, or officers of such enterprise [] certify to the [SBA] the names
> of any attorneys, agents, or other persons engaged by or on behalf of
> such business enterprise for the purpose of expediting applications made
> to the [SBA] . . . and the fees paid or to be paid to any such persons.

15 U.S.C. § 642 (emphasis added).[36] Thus, § 642 provides the SBA a mechanism to

track 7(a) program participants and imposes a single consequence for nondisclosure

of compensation: "no loan shall be made." *Id.* To facilitate those purposes, § 642

requires disclosure of (1) the identity of any person a loan applicant engages to help

expedite the applicant's SBA loan application and (2) the fees that person receives.

But those requirements are prerequisites to the SBA's decision to participate in a

lending arrangement—not prerequisites to compensation. *Id.* If a loan is made

without the required disclosures, § 642 does not impose any subsequent consequence

or otherwise preclude agents from receiving compensation. Consequently, an

applicant's failure to disclose compensation under § 642 does not operate to

extinguish a party's contractual entitlement to compensation.

And JLK does not explain how PMF's alleged concealment of JLK's disclosure

---

[36] JLK does not clearly allege that PMF was "engaged by or on behalf of such business enterprise for
the purpose of expediting applications made to the [SBA]," so it is not clear from the face of the
complaint whether § 642 applied to compel disclosure in the first instance. The court nonetheless
assumes for the purpose of this analysis that § 642 required JLK to disclose the compensation it paid
PMF.

obligation rendered PMF's representation about its commission materially false in this case. As explained, § 642 makes fee disclosure a prerequisite to the SBA's lending or guaranteeing; it does not make an agent's fee dependent on disclosure or otherwise "say [undisclosed fee recipients] don't have the right to a commission"[37] under a contract, as JLK appears to argue. Thus, PMF's alleged concealment of JLK's disclosure obligation (though perhaps consistent with unasserted breach of contract or fiduciary duty theories) and JLK's resulting nondisclosure do not render PMF's alleged representation concerning its entitlement to its commission materially false. Moreover, JLK received an SBA guaranteed loan with PMF's assistance and despite JLK's failure to disclose PMF's fee, so § 642's prerequisite to lending does not appear to have prevented PMF from satisfying its contractual obligation to arrange financing in this instance. Because § 642 does not render PMF's representation materially false, § 642 does not support JLK's count for constructive fraud.

Second, 13 C.F.R. § 103.5(c) also does not render PMF's alleged statements concerning its entitlement to its commission materially false.

Again, some background is in order. Section 103.5(c) is one regulation in a series that empowers the SBA to regulate 7(a) loan program participants. 13 C.F.R. §§ 103.1–5. The series begins by defining certain program participants, broadly defining the term "Agent" to include, among others, a "consultant, packager, lender service provider, or any other person representing an Applicant or Participant by conducting business with SBA." 13 C.F.R. § 103.1(a). Section 103.1(d) further defines

---

[37] Tr. Hr'g Mot. Dismiss Adversary Proceeding 6:14–15.

14

a "Lender Service Provider" as a subcategory of "Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." 13 C.F.R. § 103.1(d). And a "Packager" is "an Agent who is employed and compensated by an Applicant or lender to prepare the Applicant's application for financial assistance from SBA. SBA determines whether or not one is a 'Packager' on a loan-by-loan basis." 13 C.F.R. § 103.1(e). The series also limits "[w]ho may conduct business with [the] SBA," and authorizes the SBA to "suspend or revoke the privilege of any Agent to conduct business with [the] SBA." 13 C.F.R. §§ 103.2–3.

Particularly relevant to the court's analysis here, § 103.5 specifies how the SBA regulates various categories of agents' fees. 13 C.F.R. § 103.5 ("How does SBA regulate an Agent's fees and provision of service?"). Critically, § 103.5 distinguishes between categories of agents, proclaiming separate rules for "compensation agreement[s]" of "Applicant[s], Agent[s], [and] Packager[s]," on the one hand, and "written agreement[s]" for "Lender Service Provider[s]" (who work for and may receive compensation from lenders) on the other. *Id.* For example, the "SBA provides the form of compensation agreement" for applicants, agents, or packagers and requires, among other things, that the compensation agreement provide for refund of compensation to the extent the SBA deems compensation unreasonable. *Id.* But the SBA merely provides a "suggested form of agreement" for lender service providers and gives lenders "reasonable discretion in setting compensation for Lender Service Providers." *Id.* And importantly, though lender service providers may not directly

15

charge compensation to an applicant, packagers and referral agents may receive compensation from applicants. *Compare* 13 C.F.R. 103.5(b) (requiring agents or packagers to refund compensation *to the applicant* if the SBA deems compensation unreasonable), *and* 13 C.F.R. 103.1(f) ("The Referral Agent may be employed and compensated by either an Applicant or a lender."), *with* 13 C.F.R. 103.5(c) (stating that Lender Service Providers' "compensation may not be directly charged to an Applicant or Borrower").

These regulations, however, do not disqualify a non-compliant agent from receiving compensation. Instead, the regulations contemplate only regulatory or contracted-for consequences of improper compensation. Specifically, § 103.4 imposes a regulatory consequence for charging fees that are unreasonable or inconsistent with the parties' compensation agreement: The improper charge "is good cause for suspension or revocation of the [Agent's] privilege to conduct business" with the SBA. 13 C.F.R. § 103.4. And § 103.5(b) requires that compensation agreements impose their own contractual consequences, including by requiring, as a contractual remedy, that an agent must refund the portion of any fee that exceeds the amount the SBA subsequently deems unreasonable. 13 C.F.R. § 103.5. Thus, rather than purporting to alter substantive rights between parties, "[b]y requiring a compensation agreement to which the lender and applicant also are parties before an agent may receive a fee, 13 C.F.R. § 103.5(a), the SBA made agent compensation an issue to be settled *by contract* among the lender, applicant, and agent—not a statutory or regulatory entitlement." *Am. Video Duplicating, Inc. v. City Nat'l Bank*, No. 2:20-cv-04036-JFW-

16

JPR, 2020 WL 6882735, at *2 (C.D. Cal. Nov. 20, 2020).

Here, the regulations do not negate PMF's contractual entitlement to its commission. As JLK argues, § 103.5(c) provides that lender service providers may not charge compensation to loan applicants. But the allegations in the second amended complaint do not support the inference that PMF is a lender service provider to JLK. Instead, the alleged facts suggest the commission is to compensate PMF for its services as an applicant's agent under § 103.5(a) and (b)—perhaps as JLK's packager or consultant. Because § 103.5(c) does not apply to JLK's relationship to PMF, it does not bear on PMF's entitlement to the commission JLK paid PMF under the consulting agreement. Moreover, even if PMF's commission violated the relevant regulations, the effect of any violation would be either a regulatory consequence affecting PMF's privilege to conduct business with the SBA or a contractually-prescribed refund of whatever portion of the commission the SBA subsequently deemed unreasonable— not automatic loss of PMF's contractual entitlement to the entire commission. Consequently, the regulations do not render PMF's alleged statements concerning its entitlement to its commission materially false.

Because JLK's theory does not support the conclusion that the movants made any material misrepresentation of fact under the first three elements of constructive fraud, the court does not further scrutinize whether the circumstances of the alleged representations satisfy the other elements of constructive fraud. Instead, because JLK's theory is not viable as pled, the court DISMISSES this count. And though the court grows weary of JLK's capricious approach to pleading, the court dismisses this

17

count without prejudice. JLK will have one final opportunity to articulate a viable theory of constructive fraud in connection with the consulting agreement.

**B.      JLK Pleads PMF and Brugman Engaged in Constructive Fraud in Connection with the MCA Agreement But Does Not Adequately Plead This Count Against Burger**

In count six, JLK appears to allege that PMF, Burger, and Brugman engaged in constructive fraud by using their consulting relationship to coerce JLK into a transaction that benefited PMF and harmed JLK. Specifically, JLK alleges PMF and Brugman represented to JLK that JLK was receiving a loan with a reasonable interest rate, encouraged JLK to execute an MCA agreement that instead surreptitiously provided for usuriously high effective interest rates, disguised that agreement as a sale of receivables without alerting JLK to the discrepancy between the loan it offered and the MCA Agreement, and induced JLK to sign the MCA Agreement without reviewing it. The movants seek dismissal, arguing JLK "makes no specific allegations of fraud against Burger and Brugman"[38] and "[t]he deficiencies in the claim outlined in the Court's opinion [dismissing in part the first amended complaint] have also not been addressed with respect to PMF."[39]

At the outset, the court agrees with the movants that JLK does not specifically allege that Burger made any material misrepresentations or omissions, or otherwise engaged in constructive fraud, besides the conclusory allegations that Burger "induced" JLK to enter into the consulting agreement and "aided and abetted PMF's

---

[38] Defs.' Mot. Dismiss Second Am. Compl. 2.
[39] *Id.* at 4.

breach of fiduciary duty."[40] Consequently, the allegations concerning Burger do not satisfy Rule 9, and the court DISMISSES count six against him. But for the reasons the court explains below, though JLK's allegations concerning PMF and Brugman could use further elaboration, the court nonetheless determines JLK sufficiently pleads constructive fraud as to movants PMF and Brugman.

First, JLK adequately pleads that PMF and Brugman made a false statement of material fact under the first three elements of constructive fraud. JLK appears[41] to premise this count on PMF's representations through Brugman that it was offering JLK a loan with a reasonable interest rate. In particular, JLK alleges that PMF made representations under the first element by alleging it "relied upon representations that [JLK] would be obtaining a loan"[42] and that "PMF . . . represent[ed] to [JLK] that the interest rates chargeable for [PMF's] brokered loans [were] reasonable and lawful."[43] JLK appears to further allege that these representations were false by alleging PMF instead "substituted terms of a sale of future receipts" and "presented Loan Documents drafted with the intent of avoiding New York's usury laws."[44] JLK alleges these misstatements were material by alleging "Plaintiff would not have

---

[40] Second Am. Compl. 29 ¶ 103.

[41] Notably, JLK's focus on alleged misconduct other than material misstatements makes it difficult to discern the allegedly false statements at issue from the face of the complaint. *See, e.g., id.* at 26 ¶ 92 (alleging failure of consideration and self-dealing); *id.* at 26–27 ¶95 (alleging "[t]here had never been a meeting of the minds"); *id.* at 27 ¶ 98 (alleging breach of confidential and fiduciary duties); *id.* at 28 ¶ 100 (alleging breach of fiduciary duty). This confusion may stem in part from the requirement that JLK plead the existence of a fiduciary and confidential relationship, which JLK establishes through allegations concerning PMF's representations of its consulting services, among others. *See, e.g., id.* at 7 ¶ 21 (alleging JLK "relied on PMF's representations of the array of services, particularly loan applications"); *see also* JLK's Opp'n Mot. Dismiss 5 ("PMF had represented its expertise in business and lending matters, which [JLK] relied upon.").

[42] Second Am. Compl. 28 ¶ 102.

[43] *Id.* at 28 ¶ 100.

[44] *Id.* at 28 ¶¶ 100–01.

agreed to such unreasonable interest rates."[45] Drawing all reasonable inferences in favor of JLK, the court infers that PMF made these alleged representations at the time of the April 5 loan, after the consulting relationship arose. Consequently, JLK sufficiently alleges the first three elements of constructive fraud as to PMF and Brugman.

In contrast, JLK makes no allegations from which the court could reasonably infer that Burger made a materially false representation with respect to the MCA Agreement. As a result, JLK does not plead the first three elements of constructive fraud against Burger and, therefore, does not state a claim for constructive fraud against Burger under this count.

Next, the court infers PMF's intent that JLK rely on its representations of reasonable loans under the fourth constructive fraud element from allegations concerning PMF's alleged attempts to disguise the nature of the transactions. In particular, JLK alleges, "[t]hroughout the initial negotiations for credit, Plaintiff only inquired about a loan" and "was never informed . . . that there would be no interest rate because the transaction was a purchase of receivables."[46]  JLK also alleges Brugman "discouraged any review of the transaction document"[47] and that Brugman and PMF "prevented Plaintiff from conducting a review of the agreement prior to execution."[48] These allegations support the inference that PMF intended JLK to rely instead on PMF's oral statements that it was offering a reasonable loan.

---

[45] *Id.* at 27 ¶ 98.
[46] *Id.* at 26 ¶ 93.
[47] *Id.* at 26 ¶ 94.
[48] *Id.* at 26–27 ¶ 95.

Though the characterization of the transaction in the MCA Agreement arguably supports the contrary inference, drawing all reasonable inferences in JLK's favor, the court determines JLK also sufficiently pleads justifiable[49] reliance at this stage.[50] In particular, JLK makes several allegations concerning its "limited resources, education, and experience,"[51] and "lack of sophistication about lending,"[52] "banking, loans[,] or MCAs."[53] Those allegations, together with allegations that "PMF used its position of trust and confidence to influence [JLK] to enter the [MCA Agreement]"[54] and PMF's alleged efforts to prevent JLK's review[55] of the MCA

---

[49] As the court explained in its order dismissing this count of the First Amended Complaint, *see* Order First Am. Compl., Dkt. No. 76, Mar. 19, 2025, courts have inconsistently articulated the degree of reliance required under New York law or have improperly equated reasonable and justifiable reliance. Se*e, e.g., Gordon & Co. v. Ross*, 84 F.3d 542, 546 (2d Cir. 1996) (construing New York Law and determining "[t]he proper test of reliance in a fraud case is not 'reasonable' reliance, it is 'justifiable' reliance, a clearly less burdensome test"); *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove . . . reasonable reliance on the part of the plaintiff . . . ."); *Zackiva Commc'ns Corp. v. Horowitz*, 826 F. Supp. 86, 89 (S.D.N.Y. 1993) (requiring only "reliance by the other party"). The highest state court in New York, however, appears to hold that the elements for fraud include "justifiable reliance of the other party on the misrepresentation or material omission." *Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (outlining elements of actual fraud); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009) (requiring only justifiable reliance for a fraud claim). Justifiable reliance is also consistent with the standard the Supreme Court articulated governing common law fraud in *Field v. Mans*, 516 U.S. 59 (1995). Consequently, despite the inconsistent authority, the court focuses its inquiry on the standards governing justifiable reliance in this case.

[50] As the court also explained, courts rarely determine whether a party justifiably relied as a matter of law at the motion to dismiss stage of litigation, instead reserving the issue for summary judgment or trial. *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 496 (S.D.N.Y. 2012) (quoting *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011)); *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921, 922–23 (N.Y. 2015) (stating that reasonable reliance is not to be resolved on a motion to dismiss). *But see Bango v. Naughton*, 584 N.Y.S.2d 942, 943–44 (N.Y. App. Div. 1992) (reversing denial of motion to dismiss because contract meaningfully contradicted the alleged prior oral representations, precluding plaintiff's claim of reliance on these alleged representations).

[51] Second Am. Compl. 26 ¶ 93.

[52] *Id*. at 25–26 ¶ 91.

[53] *Id*. at 25 ¶ 89.

[54] *Id*. at 27 ¶ 97.

[55] *Id*. at 26–27 ¶ 95.

agreement and rush JLK through the application process,[56] support the conclusion that JLK justifiably relied on "PMF's superior lending knowledge"[57] in entering the MCA agreement.

JLK adequately pleads PMF's misrepresentations injured JLK by pleading that it paid PMF interest at a "usurious and unconscionable"[58] rate. For example, JLK pleads that it paid PMF $163,700 on an alleged loan with "an imputed annual interest rate of 294.3%,"[59] and that "Plaintiff would not have agreed to such unreasonable interest rates"[60] and "would never have entered the transactions"[61] if it had known the rate charged. These allegations satisfy JLK's burden to plead that it sustained an injury as a result of the alleged fraud.

Finally, JLK now satisfies its burden to plead a confidential relationship. As the court explained in its prior order granting in part the movants' motion to dismiss the first amended complaint,[62] a confidential relationship satisfies this element if the alleged fraudster "held himself out as having[] superior knowledge and recognized that the other person confided in him for guidance." *Hutchins v. Utica Mut. Ins. Co.*, 484 N.Y.S.2d 686, 687 (N.Y. App. Div. 1985). If the relevant relationship is also a businesses relationship, the nature of the relationship must have warranted the plaintiff's lack of investigation or prudence, and the representation must concern matter on which the defendant has superior knowledge or expertise. *Brown v.*

---

[56] *Id.* at 26 ¶ 94.
[57] *Id.* at 25 ¶ 91.
[58] *Id.* at 27 ¶ 97.
[59] *Id.*
[60] *Id.* at 27 ¶ 98.
[61] *Id.* at 27–28 ¶ 99.
[62] Order First Am. Compl. 23–24, Dkt. No. 76, Mar. 19, 2025.

*Lockwood*, 432 N.Y.S.2d 193, 195–96 (N.Y. App. Div. 1980).  Here, the allegations that PMF contracted to offer consulting services concerning financing tailored to JLK's individual business needs[63] supports the conclusion that PMF held itself out as having superior knowledge concerning loans and other forms of financing. Coupled with PMF's alleged efforts to prevent JLK's review of the MCA Agreement[64] the allegations support the reasonable inference that PMF exerted a level of controlling influence at this stage, as is required to plead a confidential relationship under New York law. Though the parties are in a business relationship, JLK sufficiently alleges that the relevant representations concern the subject of PMF's purportedly superior expertise. Consequently, JLK sufficiently pleads a qualifying relationship under the final constructive fraud element at this stage.

Because the second amended complaint satisfies JLK's burden to plead all elements of constructive fraud against PMF and Brugman, the court DENIES the movants' motion to dismiss this count.  For the reasons explained above, however, the court GRANTS the motion to dismiss count six against Burger.

## II.    Racketeering

JLK alleges movants Brugman and Burger engaged in racketeering under 18 U.S.C. § 1962(c) and seeks trebled damages under 18 U.S.C. § 1964(c). Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

---

[63] Second Am Compl. 25 ¶ 88.
[64] *Id.* at 26–27 ¶¶ 94–95.

At the outset, the court notes that the movants once again urge the court to apply eight factors JLK must allege to plead its RICO count citing *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014).[65] These factors include the requirement that a RICO plaintiff allege the movants used, in the operation of the enterprise, income derived from the collection of an unlawful debt. *Id.* The factors set out in *Dillon* come from *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985). As explained in the court's prior order, in *Durante* the court considered RICO counts under §§ 1962(a), (c) and (d). Section 1962(a), among other things, creates a cause of action against defendants who use income in operation of a RICO enterprise. Here, JLK brings only a § 1962(c) action, which does not require that the movants used income derived from the collection of an unlawful debt. Thus, the court will apply the same elements it did in its prior two orders.

To state a claim under § 1962(c), the plaintiff must plead: (1) that the defendant committed racketeering offenses through a pattern of racketeering activity or a collection of an unlawful debt, 18 U.S.C. § 1962(c); *see also United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995) (requiring the plaintiff to establish "that the defendant's participation was through a pattern of racketeering activity"); (2) that the defendant's conduct was the proximate cause of the plaintiff's injury, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008); and (3) that the defendant participated in the conduct of an enterprise's affairs, *Bennett*, 44 F.3d at 1374.[66]

---

[65] Defs.' Mot. Dismiss Second Am. Compl. 5.
[66] A RICO plaintiff must also allege that the defendants engaged in interstate commerce. *Bennett*, 44 F.3d at 1374. The defendants argue JLK fails to allege that the defendants engaged in conduct affecting interstate commerce. But JLK clearly alleges facts demonstrating the out of state defendants

Here, JLK alleges the movants engaged in collection of unlawful debts premised on two theories. First, JLK alleges that because PMF was not entitled to its commission under the consulting agreement, PMF's collection of the commission was a collection of unlawful debt. Second, JLK alleges that the MCA transaction it entered into with PMF was a disguised loan rather than sale of receivables, and because the interest rate on the loan far exceeded New York's usury cap, the movants violated § 1962(c) by participating in collecting on the alleged unlawful debt

JLK's first theory fails outright because § 1961(6) of the RICO act provides that an "unlawful debt" is either a usurious loan or a debt incurred through an illegal gambling operation. 18 U.S.C. § 1961(6). Here, JLK premises this theory on its argument that PMF was not entitled to a commission under SBA regulations but does not allege that the commission was a usurious loan or an illegal gambling debt. For this reason, JLK cannot premise its RICO count on this theory, and the court will turn to JLK's second theory in which it argues that the MCA transaction it entered with PMF was an unlawful debt under the RICO statute.

In its prior order the court found that JLK adequately pled that the MCA transaction it entered with PMF was an unlawful debt under the RICO statute. The court, however, dismissed the RICO count, explaining that JLK failed to allege that each defendant participated in the collection of unlawful debts and failed to plead that the movants conducted the affairs of an enterprise. The court will again analyze those two elements, focusing on the same two issues.

---

engaged in interstate commerce by brokering, soliciting, and entering transaction with a Missouri entity.

This time, the court concludes that JLK adequately pleads both elements—collection of an unlawful debt and conducting the affairs of an enterprise—and, therefore, DENIES the movants' motion to dismiss the RICO count as to movants Brugman and Burger.

### A.    JLK Pleads an Enterprise Distinct from the Culpable Persons

As previously stated, RICO requires plaintiffs plead that each defendant conducted the affairs of an enterprise. *Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir. 1982) ("The RICO Act proscribes conduct in which one party . . . acts upon . . . the enterprise.") (internal quotation marks omitted). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Additionally, an associated-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

At the outset, the court must determine whether JLK is attempting to plead an associated-in-fact enterprise. Certain of JLK's allegations make it unclear whether JLK intended to allege an associated-in-fact enterprise comprised of all or some of the movants. Specifically, JLK states that Brugman and Burger "are associated in fact for the common purposes of collecting on an unlawful debt."[67] At oral argument, JLK's counsel did not commit to whether JLK intended to allege an associated-in-fact

---

[67] Second Am. Compl. 49 ¶ 168.

enterprise.

But because PMF is explicitly alleged to be the enterprise, the court will not construe the complaint to allege an associated-in-fact enterprise. JLK also clearly alleges that PMF is a Delaware limited liability company,[68] and an LLC can be an enterprise under the RICO statute. 18 U.S.C. § 1961(4). Furthermore, JLK's allegation that PMF is the enterprise appears consistent with its choice not to name PMF as a defendant to the RICO count because the enterprise to a RICO cause of action cannot simultaneously be a RICO defendant. Thus, in analyzing the sufficiency of JLK's RICO allegations, the court will assume PMF—not an association—is the enterprise.

The court must next determine whether JLK alleges that PMF, the enterprise, is distinct from the alleged culpable persons, Brugman and Burger.

A RICO plaintiff, in addition to alleging an enterprise, must also identify the defendants as "culpable persons" distinct from the enterprise, *Bennett*, 685 F.2d at 1061; *see also United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 570 (8th Cir. 1996) ("The enterprise must be distinct from the person named as the RICO defendant."), where the "culpable persons" are the people or entities that conduct the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) ("*[S]ome* part in directing the enterprise's affairs is required."); *see also United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–57 (7th Cir. 2013) (holding that plaintiff failed to allege that defendants

---

[68] *Id.* at 2 ¶ 2.

conducted the affairs of the enterprise and upholding dismissal of RICO claims).

While a corporation can be a culpable person, a RICO plaintiff cannot subvert the requirement to plead a distinct enterprise and culpable persons by bringing a RICO cause of action against a corporation and alleging it was part of an associated-in-fact enterprise consisting of itself and its officers and employees. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (explaining the person-enterprise distinction); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself."). Thus, a corporation cannot generally be liable under the RICO statute for operating itself.

JLK alleges PMF is the enterprise[69] and alleges Brugman and Burger are culpable persons.[70] JLK alleges that Brugman and Burger engaged in a variety of activities in support of PMF's scheme to create and collect unlawful debts. Specifically, JLK alleges that Brugman acted as PMF's "account manager"[71] and alleges that Burger was "the Chief Operating Officer for PMF."[72] Thus, JLK adequately pleads an enterprise distinct from the alleged culpable persons.

In its two prior complaints, JLK included several allegations describing a variety of relationships between the movants that could potentially blur the distinctiveness between PMF and the alleged culpable persons. In its two prior

---

[69] *Id.* at 48 ¶ 163.
[70] *Id.* at 47 ¶¶ 160–62.
[71] *Id.* at 3 ¶ 4.
[72] *Id.* at 3 ¶ 3.

28

dismissal orders, the court expressed concern that these allegations could prevent JLK from adequately pleading its RICO count. Nevertheless, JLK once again includes similar allegations in this complaint. In this complaint, in an apparent effort to attribute one defendant's conduct to every other defendant, JLK alleges that "[a]t all relevant times, . . . each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other Defendant,"[73] and further alleges "[e]ach of the Defendants' acts alleged herein was done with the permission and consent of each of the other Defendants."[74]

The court, however, must read the complaint in a light most favorable to the plaintiff.  For the following three reasons, the court will disregard these allegations in paragraph 12 of the complaint for the purpose of determining whether JLK pled a distinct enterprise and culpable persons. First, the allegations are so equivocal that they are substantively meaningless. Second, they contradict more specific allegations describing the relationships between the movants found elsewhere in the complaint. And third, some of the allegations include unsupported conclusions that can be ignored under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Notably, in paragraph 12, JLK does not commit to any single relationship it lists in these allegations. Instead, JLK uses "and/or" to say that any one of these relationships or a combination of them could exist among the movants. For example, under the allegations in paragraph 12, JLK could be suggesting that Brugman was both an alter-ego and an employee of PMF. But, of course, if one of these relationships

---

[73] *Id*. at 4 ¶ 12.
[74] *Id.*

29

existed, then it is implausible—perhaps impossible—that the other relationship could exist. Furthermore, under these allegations, one defendant could be simultaneously the employer and employee of another defendant. For example, Brugman could both be Burger's employee and Burger could be Brugman's employee. These examples demonstrate the absurdity of these allegations, and when considered in its entirety, paragraph 12 does not describe any meaningful relationship between the movants.

Furthermore, these allegations appear to contradict more specific allegations made elsewhere in the complaint, including in the background section. Indeed, JLK makes more specific allegations describing the relationships between the movants but obscures these allegations by alleging that each defendant acted as each other defendant's "agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer" of each other defendant.[75] For example, JLK alleges that Burger  is the "Chief Operating Officer for PMF,"[76] and Brugman is the "account manager for [PMF]."[77] But if you take JLK's allegations in paragraph 12 literally, then Burger could be Brugman's employee or alter-ego. Because the more specific allegations appear to be consistent with other allegations in the complaint regarding each defendant's conduct, the court is inclined to ignore the vague and inarticulate allegations in paragraphs 12.

Finally, the court can ignore some of the allegations in paragraph 12 because they amount to unsupported conclusions that the court can disregard under a Rule

---

[75] *Id.*
[76] *Id.* at 3 ¶ 3.
[77] *Id.* at 3 ¶ 4.

12(b)(6) analysis. For example, the question of whether an agency or alter-ego relationship exists is a fact-intensive one that would likely require JLK to plead additional facts beyond the mere assertion that the relationship existed between two of the movants. Here, in paragraphs 12, JLK does not clearly assert the existence of any specific relationship, and even if it did, those relationships are not sufficiently supported by facts pled elsewhere in the complaint to meet Rule 12(b)(6)'s pleading standards.

In sum, the court reads the complaint in a light most favorable to the plaintiff and concludes that JLK pleads an enterprise distinct from the alleged culpable persons, despite the allegations in paragraph 12.

### B.    JLK Pleads that Each Culpable Person Participated in the Collection of an Unlawful Debt

Next, the court must consider whether JLK pleads that each defendant committed racketeering offenses and participated in the conduct of the enterprise's affairs. To do this, JLK must allege that the culpable persons participated in the collection of an unlawful debt. *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985) (citing 18 U.S.C. §§ 1962(a) and (c)).  But JLK does not need to allege a pattern of racketeering activity and only needs to allege that the movants participated in collecting a single unlawful debt. *United States v. Grote*, 961 F.3d 105, 119 (2d. Cir. 2020) ("RICO offenses may be predicated on a *single instance* of collection of an unlawful debt.") (emphasis added). The plaintiff also does not need to allege that each culpable person explicitly collected payment on the unlawful debt. Instead, courts have liberally construed participation in the collection of unlawful

31

debt to include any "single act which would tend to induce another to repay on an unlawful debt." *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) (citing *United States v. Pepe*, 747 F.2d 632, 673–75 (11th Cir. 1984)); *Golden Foothill Ins. Servs., LLC v. Spin Cap., LLC*, 24-cv-8515 (AS), 2025 WL 2402616, at *10 (S.D.N.Y. Aug. 19, 2025) (concluding allegations that defendants "induc[ed] plaintiffs to take out a loan to cover the balance of the agreements" satisfied burden to plead "the defendant[s] aided collection of the debt *in some manner*" (emphasis original)) (quoting *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986)). Thus, courts have held that an actual exchange of money is not required to plead participation in the collection of an unlawful debt. *Eufrasio*, 935 F.2d at 576; *see, e.g.*, *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016) (determining that repossession of collateral can constitute collection of an unlawful debt); *Brice v. Haynes Invs., LLC*, 548 F. Supp. 3d 882, 894 (N.D. Cal. 2021) (determining that evidence RICO defendants created a predatory lending scheme could be sufficient for a jury to find that the defendants participated in the collection of an unlawful debt).

The court concludes that JLK pleads sufficient facts against Burger and Brugman to support its RICO count at this stage of the litigation. As previously explained, the movants do not contest that JLK successfully pleads that the MCA transaction was a loan. Moreover, in the court's most recent order, the court concluded that JLK adequately pled that the MCA transaction at issue was a loan with an interest rate exceeding twice the legal interest rate in New York. Thus, JLK pleads the existence of an unlawful debt. The movants instead argue that JLK does

not directly connect any of the culpable persons' alleged conduct to the collection of an unlawful debt.

The issue, therefore, is whether JLK adequately pleads that Brugman and Burger, as alleged culpable persons, participated in the collection of an unlawful debt. To plead participation in the collection of an unlawful debt, JLK does not need to specifically plead that each culpable person collected payment on the unlawful debt. Rather, as previously stated, JLK needs only to allege that the culpable persons engaged in an activity that could induce it to make payments on an unlawful debt.

JLK makes several allegations explaining how Brugman and Burger participated in the collection of an unlawful debt. JLK alleges that Brugman contacted JLK, offering PMF's services,[78] and that Brugman discouraged JLK from reviewing the MCA transaction contract.[79] JLK also alleges that Brugman did not disclose that the transaction would be characterized as a sale of receivables, which induced JLK to enter the transaction.[80] JLK further alleges that Brugman and Burger coerced JLK to enter an additional MCA transaction to pay off the MCA it entered with PMF[81] and that Brugman and Burger "underwr[o]te, fund[ed], service[d] and collect[ed] upon unlawful debt" by operating PMF.[82]

Between Brugman and Burger, JLK alleges significant involvement in the solicitation and creation of multiple unlawful loans. Further, JLK alleges that

---

[78] *Id.* at 4 ¶ 13.
[79] *Id.* at 26 ¶ 94.
[80] *Id.* at 26–27 ¶¶ 95, 98.
[81] *Id.* at 46 ¶ 153.
[82] *Id.* at 50 ¶ 170.

payment on the MCA transaction was set up through ACH debit based on the terms of the contracts. Thus, any efforts to induce JLK to enter into the transaction, including the ACH debit provisions, could be construed as efforts to induce payment on an unlawful debt.

For these reasons, the court, after drawing all reasonable inferences in JLK's favor, is satisfied that the complaint lends itself to at least one plausible reading of JLK's RICO count to support a determination that Burger and Brugman participated in the collection of an unlawful debt. The court, therefore, DENIES the movants' motion to dismiss.

## LEAVE TO AMEND

JLK requests leave to file an amended complaint. The movants oppose JLK's request, seeking dismissal with prejudice.

Rule 15(a) of the Federal Rules of Civil Procedure, which applies to this adversary proceeding under Rule 7015 of the Federal Rules of Bankruptcy Procedure, governs amended pleadings. Fed. R. Civ. P. 15; Fed. R. Bankr. P. 7015. Under Rule 15(a)(2), after service of a responsive pleading or motion under Rule 12(b), a party may amend its pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15. Though "[t]he court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), the court has discretion to deny a motion for leave to amend for "compelling reasons" including prejudicial delay, bad faith, or futility. *Horras v. Am. Cap. Strategies, Ltd.*, 729 F.3d 798, 804 (8th Cir. 2013) (quoting *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th

Cir. 2005)).

In the present adversary proceeding, justice compels the court to grant JLK's request for leave to amend. Though the court's patience grows thin, the deficiencies in the present complaint are not compelling enough reasons to deny JLK's request for leave to amend. The record does not sufficiently establish at this stage that amendment of those counts would prejudicially delay this adversary proceeding, that JLK seeks amendment in bad faith, or that amendment would be futile. Consequently, the court GRANTS JLK's motion for leave to amend.

## CONCLUSION

For the reasons explained above, the court GRANTS the movants' motion to dismiss count one and GRANTS the motion to dismiss count six against defendant Burger only.  The court, however, DENIES the motion to dismiss count six against all other movants and DENIES the motion to dismiss count ten.  The court further GRANTS JLK's request for leave to file an amended complaint.  JLK may file an amended complaint as permitted by this order on or before November 12, 2025.  The defendants will have until December 12, 2025, to file their answer or responsive pleading to whatever complaint is then pending.

IT IS SO ORDERED.

Dated: 10/15/2025                         /s/ Brian T. Fenimore_____
                                          United States Bankruptcy Judge